WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jesse D. Torres, | No. CV-13-01398-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, | |
| Defendant. | |

Plaintiff Jesse D. Torres seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying his application for disability insurance benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.[1] For the following reasons, the Court reverses the Commissioner's decision and remands for an award of benefits.

## I.      Procedural Background

On November 12, 2009, Plaintiff applied for disability insurance benefits under Title II of the Act, based on disability beginning July 30, 2009. (Tr. 150.)[2] After the Social Security Administration (SSA) denied Plaintiff's initial application and his request

---

[1]  This matter is suitable for resolution based on the briefs. Accordingly, the Court denies Plaintiff's request for oral argument. *See* LRCiv. 7.2(f).

[2] Citations to "Tr." are to the certified administrative transcript. (Doc. 11.)

for reconsideration, he requested a hearing before an administrative law judge (ALJ). After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 21-32.) This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-7); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.) Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

**II.    Medical Record**

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health. The record also includes an opinion from a lay witness, and opinions from State Agency Physicians who examined Plaintiff and reviewed the records related to Plaintiff's impairments, but who did not provide treatment.

**A.    Treatment Records**

**1.    Lawrence R. Ryan, D.O.**

On July 1, 2008, Plaintiff began treatment with Dr. Ryan for diabetes. (Tr. 291.) Dr. Ryan assessed hypertension, neuropathy in diabetes, disc degeneration, and obesity. (*Id.*) On July 14, 2008, Dr. Ryan noted that Plaintiff had signs of neuropathy in his legs. (Tr. 289-90.) On August 18, 2008, Dr. Ryan noted that Plaintiff had experienced intermittent tingling, stiffness, and numbness in his hands and fingers, particularly when sleeping or driving. (Tr. 287.) Dr. Ryan referred Plaintiff for testing for his bilateral hand deficit. (Tr. 287-88.) Dr. Ryan also noted that Plaintiff had anxiety and prescribed Lexapro. (*Id.*) On October 24, 2008, Dr. Ryan noted that Plaintiff experienced shortness of breath when walking or working in the yard and again assessed Plaintiff with anxiety. (Tr. 284-85.)

On November 17, 2008, Dr. Ryan noted that Plaintiff was having frequent episodes of low blood sugar, anxiety, and decreased energy. He opined that Plaintiff's diabetes was uncontrolled and adjusted his medications. (Tr. 278-79.) Dr. Ryan

1  prescribed Plaintiff medication for hypertension, high cholesterol, and diabetes.
2  (Tr. 270.)

3  **2.    Joseph Gottesman, M.D.**

4  In July 2008, Plaintiff began receiving treatment from Dr. Gottesman for his
5  chronic low back pain.   (Tr. 268.)   In July 2008, Dr. Gottesman noted that on
6  examination Plaintiff had edema upon palpation of his lumbar facets at L4-L5 and L5-S1,
7  and that pressure on the facets produced radiating pain and numbness in Plaintiff's legs.
8  (*Id.*)  Dr. Gottesman administered a series of injections for Plaintiff's back pain in July
9  (one shot), September (three shots), November (one shot), and December 2008 (one
10 shot).   (Tr. 265-68.)   Dr. Gottesman administered another injection in April 2009.
11 (Tr. 264.) Dr. Gottesman's treatment notes consistently record low back pain.  (Tr. 264-
12 68.)  On May 16, 2009, Plaintiff received an MRI of his lumbar spine, which revealed
13 narrowing of the lumbar spinal canal with degenerative changes, spinal canal stenosis in
14 the lumbar spine, a protruding disc, and "grade I retrolisthesis of L5 on S1."  (Tr. 269.)

15 Plaintiff returned to Dr. Gottesman in December 2009 and reported increasing
16 back pain. (Tr. 387-89.)  Plaintiff reported that his medications were not working as well
17 as they had in the past, and although he had discussed back surgery with his doctor, it had
18 been "denied."  (Tr. 387.)  Dr. Gottesman administered at least six more injections for
19 Plaintiff's lower back pain between December 3, 2009 and May 11, 2010.  (Tr. 374, 375,
20 376, 378, 382, 386.)  Dr. Gottesman continued to treat Plaintiff for his low back pain with
21 pain medications, Oxycontin and Percocet, and numerous injections between June 3,
22 2010 and February 22, 2011.  (Tr. 532, 535, 539, 542, 545, 548, 551, 557, 561, 564, 566,
23 570, 580, 583, 586, 589.)   He administered additional injections between June and
24 December 2011.  (Tr. 641, 645, 649, 653, 657, 660, 663, 670, 673, 676, 679.)

25 **3.    Ricardo Celaya, M.D.**

26 In March 2009, Plaintiff received injections from Dr. Celaya for his low back pain.
27 (Tr. 335.)  Dr. Celaya administered at least five more injections during 2009.  (Tr. 366-
28 71.)  Dr. Celaya assessed Plaintiff with low back pain and degeneration of the lumbar

1    intervertebral discs.  (Tr. 345, 346-38, 353.)  He noted that Plaintiff had low back pain

2    that radiated into his lower extremities.  (Tr. 365-67.)  In November 2009, he noted that

3    Plaintiff had increased low back pain and numbness.  (Tr. 371.)

4              **4.    James Beauchene, M.D.**

5         On  April  21,  2009,  Dr. Beauchene  examined  Plaintiff's  hands  and  wrists.

6    (Tr. 307.)  He noted that Plaintiff had pain in his left hand and difficulty flexing his left

7    "long and ring fingers."  (*Id.*)  Plaintiff reported that using a splint and taking Vicodin

8    had not relived his symptoms.  (*Id.*)  On examination, Plaintiff had a decreased range of

9    motion in his fingers.  (Tr. 309.)  During a follow-up examination, on April 28, 2009,

10   Dr. Beauchene  noted  continued  numbness  and  tingling  in  Plaintiff's  hand,  and  that

11   Plaintiff was dropping objects.  (Tr. 312)  Dr. Beauchene found positive Tinel's and

12   Phalen's tests in both carpal and ulnar tunnels.  (*Id.*)  He also found "locking of the left

13   ring finger in composite flexion with snapping from flexion to extension."  (*Id.*)

14        A May 4, 2009 motor nerve conduction test of Plaintiff's left arm revealed

15   findings consistent with left carpal tunnel syndrome.  (Tr. 322-23.)  On May 12, 2009,

16   Dr. Beauchene noted that Plaintiff continued to experience numbness and tingling in both

17   hands,  finger  locking,  and  problems  dropping  objects.    (Tr. 315.)    Dr. Beauchene

18   discussed  treatment  options  with  Plaintiff,  including  carpal  tunnel  release  surgery.

19   (Tr. 315-16.)  On June 9, 2009, Dr. Beauchene opined that Plaintiff should avoid "lifting

20   or  force  greater  than  [five]  pounds  with  either  hand,"  repetitive  use  of  either  hand,

21   climbing to unprotected heights, and exposure of either hand to power tools or open

22   active machinery until he could be reassessed after carpal tunnel surgery.  (Tr. 319.)

23             **5.    Michael A. Steingart, D.O.**

24        On May 20, 2010, Plaintiff saw Dr. Steingart for right shoulder pain.  (Tr. 452.)

25   Dr. Steingart noted tenderness over the top of the shoulder and pain with most motions.

26   (*Id.*)   An MRI of Plaintiff's shoulder revealed that his prior surgical repair had not

27   "detach[ed]."  (Tr. 452.)  Dr. Steingart noted mild weakness of the right scapular muscles

28   and recommended physical therapy.  (*Id.*)

1    On October 4, 2010, Dr. Steingart administered an injection for Plaintiff's right

2    shoulder pain.  (Tr. 684.)  On November 22, 2010, Dr. Steingart examined Plaintiff and

3    noted the he continued to have right shoulder pain and carpal tunnel syndrome in his left

4    wrist.  (Tr. 681-82.)  Plaintiff told Dr. Steingart that he could not afford physical therapy

5    for his shoulder or surgery for the carpal tunnel syndrome in his wrist.  (*Id.*)

6    **B.    Opinion Evidence**

7    **1.    Dr. Gottesman**

8    On May 13, 2010, Dr. Gottesman prepared a "Medical Assessment of Ability to

9    do Work-Related Physical Activities" (RFC Assessment).  (Tr. 450.)  He noted that

10   Plaintiff had been diagnosed with lumbosacral radiculopathy, osteoarthritis, degenerative

11   joint disease, degenerative disc disease, spinal stenosis, lumbosacral facet syndrome, and

12   chronic pain managed with narcotics.  (*Id.*)  He opined that Plaintiff could sit, stand, or

13   walk less than two hours each in an eight hour day, and lift or carry less than ten pounds.

14   (*Id.*)  He also opined that Plaintiff could occasionally bend, stoop, balance, crouch, and

15   kneel, and should avoid crawling, climbing, and repetitive use of his feet.  (Tr. 450.)

16   Dr. Gottesman further found that Plaintiff's pain, fatigue, and stress could be expected to

17   result in moderately severe limitations on his ability to sustain work activity.  (Tr. 451.)

18   On February 22, 2011, Dr. Gottesman reviewed his 2010 RFC Assessment and concluded

19   that Plaintiff continued to have the same limitations as set forth in that assessment.

20   (Tr. 596-97.)

21   On November 17, 2011, Dr. Gottesman completed another RFC Assessment.

22   (Tr. 636-37.)  He assessed Plaintiff with essentially the same limitations that he assessed

23   in 2010 and affirmed in February 2011.  (*Compare* Tr. 45-51 *with* Tr. 636-37.)  He

24   concluded that Plaintiff had moderately severe limitations in his ability to perform work

25   due to pain, fatigue, and dizziness.  (*Id.*)  He also noted that Plaintiff had moderately

26   severe side effects from his medications.  (Tr. 637.)

27

28

2.      **Mikhail Bargan, M.D.**

In April 2010, Dr. Bargan reviewed Plaintiff's medical records for his application for disability benefits. (Tr. 404-11.) Dr. Bargan opined that Plaintiff could occasionally lift or carry twenty pounds and could frequently carry ten pounds. (Tr. 405.) He also opined that Plaintiff could stand, walk, and sit six hours in an eight-hour day. (*Id.*) He further found that Plaintiff had no restrictions on his abilities to push or pull with his hands or feet, and that he could occasionally climb, crouch, or crawl, frequently balance, stoop, or kneel. (Tr. 405-06.) Finally, Dr. Bargan found that Plaintiff has no limits on his ability to reach, that he could frequently handle, finger, or feel, and that he should avoid "concentrated exposure" to hazards such as machinery and heights. (Tr. 407-08.)

3.      **Lay Witness Statement**

In May 2010, Plaintiff's daughter Christina Torres completed a Third Party Function Report. (Tr. 214.) She stated that Plaintiff had to lie down frequently due to back and leg pain. (*Id.*) She noted that he had difficulty sleeping, and needed help putting on his socks and shoes and bathing the lower half of his body. (Tr. 215.) She stated that Plaintiff needed reminders to take his medications. (Tr. 216.) Torres noted that Plaintiff experienced dizziness, leg pain, and difficulty gripping with his hands, particularly when driving. (Tr. 217.) She noted that Plaintiff's conditions affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, understand things, follow instructions, use his hands, and get along with others. (Tr. 219.) She also noted that Plaintiff had difficulty being around people and following instructions because his mind wandered. She further noted that Plaintiff's pain made him angry and frustrated, and that he handled stress poorly. (Tr. 220-21.)

**III.    Administrative Hearing Testimony**

Plaintiff was represented by counsel and testified at the administrative hearing. Plaintiff was in his fifties at the time of the hearing, he had completed ninth grade, and had past relevant work as a custodian. (Tr. 42.) Plaintiff testified that he had chronic

sharp back pain that radiated into his legs and caused his legs to become numb when standing.  (Tr. 44-45.)   He also stated that he had difficulty bending.  (Tr. 44, 51.)  Plaintiff testified that he could stand for about ten minutes before his legs went numb.  (Tr. 51.)  Plaintiff testified that he had injections and took prescription medication to treat his low back pain (Tr. 45), and that his pain medications, Percocet and Oxycontin, helped "a little."  (Tr. 46.)  He testified that he needed to lie down two to three times a day to relieve his pain.  (Tr. 51.)

Plaintiff also testified that he had carpal tunnel syndrome and trigger finger in his left hand and had difficulty closing his fist.  (Tr. 43, 48.)  He testified that he tended to drop "a lot of things" and spilled things.  (Tr. 48-49.)  He stated that he could lift five to ten pounds.  (Tr. 51-52.)  He also stated that he had difficulty reaching overhead due to prior rotator cuff surgery on his right shoulder.  (Tr. 53.)  He testified that his medications made him sleepy and that he napped one to two hours daily.  (Tr. 54.)  He testified that he could drive for about twenty minutes before he had to take a break and walk around. (Tr. 56-57.)

Vocational expert Kathryn Atha also testified at the administrative hearing. (Tr. 57.)  The ALJ asked Atha to consider an individual who was limited to light work (sitting six to eight hours per day, standing or walking six to eight hours per day, and lifting twenty pounds occasionally and ten pounds frequently), who needed a sit/stand option, was able to climb, crouch, and crawl occasionally, frequently able to balance, stoop and kneel, who was limited to frequent reaching with the left arm, and needed to avoid concentrated exposure to hazards.  (Tr. 58-60.)  The vocational expert testified that an individual with those limitations could perform work as a parking lot cashier, electronic assembler, and a production assembler.  (Tr. 59.)  The vocational expert also testified that an individual with the limitations that Plaintiff described, or that Dr. Gottesman identified, would be unable to perform Plaintiff's past relevant work or to sustain other full-time competitive work.  (Tr. 62, 70, 71.)

1    **IV.    The ALJ's Decision**

2    A claimant is considered disabled under the Social Security Act if he is unable "to

3    engage in any substantial gainful activity by reason of any medically determinable

4    physical or mental impairment which can be expected to result in death or which has

5    lasted or can be expected to last for a continuous period of not less than 12 months."  42

6    U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for

7    supplemental security income disability insurance benefits).  To determine whether a

8    claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20

9    C.F.R. §§ 404.1520, 416.920.

10   **A.    Five-Step Evaluation Process**

11   In the first two steps, a claimant seeking disability benefits must initially

12   demonstrate (1) that he is not presently engaged in a substantial gainful activity, and

13   (2) that his disability is severe.  20 C.F.R. § 404.1520(a)-(c).  If a claimant meets steps

14   one and two, there are two ways in which he may be found disabled at steps three through

15   five.  At step three, he may prove that his impairment or combination of impairments

16   meets or equals an impairment in the Listing of Impairments found in Appendix 1 to

17   Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is

18   presumptively disabled.  If not, the ALJ determines the claimant's residual functional

19   capacity (RFC).  At step four, the ALJ determines whether a claimant's RFC precludes

20   her from performing his past work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant

21   establishes this prima facie case, the burden shifts to the government at step five to

22   establish that the claimant can perform other jobs that exist in significant number in the

23   national economy, considering the claimant's RFC, age, work experience, and education.

24   If the government does not meet this burden, then the claimant is considered disabled

25   within the meaning of the Act.

26   **B.    The ALJ's Application of Five-Step Evaluation Process**

27   Applying the five-step sequential evaluation process, the ALJ found that Plaintiff

28   had not engaged in substantial gainful activity during the relevant period.  (Tr. 26.)  At

step two, the ALJ found that Plaintiff had the following severe impairments: "lumbar degenerative disc disease; spinal stenosis; lateral recess disc protrusion; Grade I retrolisthesis non L5 and S1; obesity, diabetes mellitus; left carpal tunnel syndrome (non-dominant hand) (20 C.F.R. § 44.152(c))." (*Id.*)

At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 27.) The ALJ next concluded that Plaintiff retained the RFC to perform "light work . . . with the following exceptions: can frequently balance, stoop, or kneel, can occasionally climb ramps, stairs, ladders, ropes, or scaffolds; can occasionally crouch or crawl." (Tr. 27.) The ALJ also found that Plaintiff was restricted to frequent handling with both hands and to frequent reaching in all directions with his "non-dominant left hand." (*Id.*) The ALJ further found that Plaintiff "should avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights, etc." (*Id.*)

At step four, the ALJ concluded that Plaintiff could not perform his past relevant work. (Tr. 36.) At step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he could perform other "jobs that existed in significant numbers in the national economy." (Tr. 31.) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (*Id.*)

**V.   Standard of Review**

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ

1  erred, however, "[a] decision of the ALJ will not be reversed for errors that are

2  harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

3       Substantial evidence means more than a mere scintilla, but less than a

4  preponderance; it is "such relevant evidence as a reasonable mind might accept as

5  adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

6  (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).   In

7  determining whether substantial evidence supports a decision, the court considers the

8  record as a whole and "may not affirm simply by isolating a specific quantum of

9  supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

10 quotation and citation omitted).

11      The ALJ is responsible for resolving conflicts in testimony, determining

12 credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

13 Cir. 1995).   "When the evidence before the ALJ is subject to more than one rational

14 interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc.

15 Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

16 **VI.   Plaintiff's Claims**

17      Plaintiff asserts that the ALJ erred in rejecting his symptom testimony, the lay

18 witness statement, and in assigning weight to the medical source opinion evidence.

19 (Doc. 12 at 10-12.)   Plaintiff asks the Court to remand this matter for a determination of

20 disability benefits.   In response, the Commissioner argues that the ALJ's decision is free

21 from legal error and is supported by substantial evidence in the record. (Doc. 21.)   As set

22 forth below, the Court finds that the ALJ erred in discrediting Plaintiff's symptom

23 testimony and in assigning weight to the medical source opinion evidence.

24      **A.   Assessing a Claimant's Credibility**

25      Plaintiff asserts that the ALJ erred in discrediting his symptom testimony.

26 (Doc. 12 at 17-21.)   An ALJ engages in a two-step analysis to determine whether a

27 claimant's testimony regarding subjective pain or symptoms is credible. *Garrison v.*

28

1    *Colvin*, 2014 WL 3397218, at *16 n.18 (9th Cir. Jul. 14, 2014) (citing *Lingenfelter v.*

2    *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

3          "First, the ALJ must determine whether the claimant has presented objective

4    medical evidence of an underlying impairment 'which could reasonably be expected to

5    produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting

6    *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not

7    required to show objective medical evidence of the pain itself or of a causal relationship

8    between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the

9    claimant must only show that an objectively verifiable impairment "could reasonably be

10   expected" to produce his pain."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d

11   at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160−61 (9th Cir. 2008)

12   ("requiring that the medical impairment 'could reasonably be expected to produce' pain

13   or another symptom . . . requires only that the causal relationship be a reasonable

14   inference, not a medically proven phenomenon").

15         Second, if a claimant shows that he suffers from an underlying medical

16   impairment that could reasonably be expected to produce his pain or other symptoms, the

17   ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how

18   the symptoms, including pain, limit the claimant's ability to work.  *See* 20

19   C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective

20   medical evidence, the claimant's daily activities, the location, duration, frequency, and

21   intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

22   medication taken, and treatments for relief of pain or other symptoms.  *See* 20

23   C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

24         At this second evaluative step, the ALJ may reject a claimant's testimony

25   regarding the severity of his symptoms only if the ALJ "makes a finding of malingering

26   based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

27   *Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

28

1    convincing reasons" for finding the claimant not credible.[3]  *Carmickle*, 533 F.3d at 1160

2    (quoting *Lingenfelter*, 504 F.3d at 1036).  "'The clear and convincing standard is the

3    most demanding required in Social Security Cases.'"  *Garrison*, 2014 WL 3397218, at

4    *15-18 (quoting *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

5         Because there was no record evidence of malingering, the ALJ was required to

6    provide clear and convincing reasons for concluding that Plaintiff's subjective complaints

7    were not wholly credible.  Plaintiff argues that the ALJ failed to do so.

8         **B.    The ALJ's Assessment of Plaintiff's Subjective Complaints**

9         As an initial matter, the ALJ discounted Plaintiff's allegations about the severity

10   of his symptoms and limitations because the objective medical record did not support

11   functional limitations that were more restrictive than the limitations the ALJ assessed.

12   (Tr. 28, 30.)  The absence of fully corroborative medical evidence cannot form the *sole*

13   basis for rejecting the credibility of a claimant's subjective complaints.  *See Cotton v.*

14   *Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit

15   excess pain testimony solely on the ground that it is not fully corroborated by objective

16   medical findings"), *superseded by statute on other grounds as stated in Bunnell v.*

17   *Sullivan*, 912 F.2d 1149 (9th Cir. 1990); *see also Burch*, 400 F.3d at 681 (explaining that

18   the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form

19   the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same).

20   Thus, absent some other stated legally sufficient reason for discrediting Plaintiff, the

21   ALJ's credibility determination cannot stand.  As discussed below, with the exception of

22   Plaintiff's testimony that his medication made him sleepy (Tr. 54), the ALJ erred in

23   discrediting Plaintiff's testimony regarding the intensity, persistence, and pace of his

24   symptoms.

25   / / /

26   / / /

27   _____

28   [3]   The Ninth Circuit has rejected the Commissioner's argument (Doc. 13 at 20) that a lesser standard than "clear and convincing" should apply.  *Garrison*, 759 F.3d at 1015 n.18.

1          **1.       Plaintiff's Activities**

2          In discounting Plaintiff's credibility, the ALJ noted that Plaintiff had "engaged in

3   a somewhat normal level of daily activity and interaction."  (Tr. 28.)  The ALJ noted that

4   Plaintiff ran errands, drove, and went shopping.  (*Id.*)  The ALJ concluded that "some of

5   the physical and mental abilities and social interactions required in order to perform these

6   activities are the same as those necessary for obtaining and maintaining employment and

7   are inconsistent with the presence of an incapacitating or debilitating condition."  (*Id.*)

8          A social security claimant need not be "utterly incapacitated to be eligible for

9   benefits."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 2007); *see also Vertigan v. Halter*,

10  260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere

11  fact that a plaintiff has carried on certain daily activities, such as grocery shopping,

12  driving a car, or limited walking for exercise, does not in any way detract from her

13  credibility as to her overall disability.").  Although daily activities may support an

14  adverse credibility finding "if a claimant is able to spend a substantial part of his day

15  engaged in pursuits involving the performance of physical functions that are transferable

16  to a work setting," the ALJ must make "specific findings relating to [the daily] activities"

17  and their transferability to conclude that a claimant's daily activities warrant an adverse

18  credibility determination.  *Fair*, 885 F.2d at 602; *see also Orn v. Astrue*, 495 F.3d 625,

19  639 (9th Cir. 2007) (finding that the ALJ erred in failing to "meet the threshold for

20  transferable work skills, the second ground for using daily activities in credibility

21  determinations").

22         Here, although the ALJ generally concluded that Plaintiff's driving, shopping, and

23  running errands could be transferred to a work setting, she failed to establish whether

24  Plaintiff spent a substantial part of his day participating in these activities.  (Tr. 28); *see*

25  *Fair*, 885 at 602.  Plaintiff testified that he could drive for about twenty minutes before he

26  needed a break, and there is no evidence about how much time Plaintiff spent running

27  errands or shopping.  Additionally, the Ninth Circuit has opined that, "[d]aily household

28  chores and grocery shopping are not activities that are easily transferable to a work

environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008).   Therefore, Plaintiff's limited activities were not clear and convincing reasons to discredit Plaintiff's pain and symptom testimony.  *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

### 2.      Inconsistencies between the Record and Plaintiff's Testimony

The ALJ also stated that she discounted Plaintiff's credibility because, although Plaintiff testified that he experienced leg numbness, there was "no diabetes related neuropathy noted and no documented lumbar spine radiculopathy." (Tr. 30.)  As part of the overall disability analysis, and in weighing various allegations and opinions, the ALJ must consider whether there are any inconsistencies in the evidence, such as a claimant's inconsistent statements.   *See* 20 C.F.R.  § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence"); Social Security Ruling 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record).  Accordingly, inconsistency between a claimant's testimony and the medical record can support an adverse credibility determination.

However, the record does not support the ALJ's finding of such an inconsistency in this case.   The record contains evidence of diabetic neuropathy in Plaintiff's legs. (Tr. 289-90.)  Additionally, Dr. Gottesman noted that Plaintiff had edema upon palpation of his lumbar facets at L4-L5 and L5-SI, and that pressure on the facets produced radiating pain and numbness in Plaintiff's legs.  (Tr. 268.)  Also, Dr. Gottesman included lumbar radiculopathy among Plaintiff's spinal diagnoses.  (Tr. 450.)  Dr. Celeya also noted that Plaintiff had radiating back pain.  (Tr. 365-66.)  This evidence is consistent with Plaintiff's testimony about his leg numbness.   Accordingly, there was no inconsistency between Plaintiff's testimony and the medical record that would provide a clear and convincing reason for discrediting his testimony.

- 14 -

The ALJ further found that Plaintiff's testimony that "pain medication [had] not been helpful" was inconsistent with his continued use of Percocet.  (Tr. 30.)  Plaintiff testified that pain medication helped "a little."  (Tr. 18.)  The ALJ does not explain why Plaintiff's testimony that pain medication helped "a little," but that it may not have completely alleviated his pain, was inconsistent with his continued use of that medication.  The Court does not find any inconsistency between Plaintiff's testimony and his continued use of Percocet.

The ALJ also discounted Plaintiff's credibility because he testified that his pain medication made him sleepy, but did not report adverse side effects to his doctors.  (Tr. 30 (citing Admin. Hrg. Ex. 26F at 38).)   Plaintiff argues that there is no inconsistency because when Dr. Gottesman inquired whether Plaintiff experienced any "adverse reactions" to his medications, he was "likely" inquiring "about more serious side effects such as liver failure, respiratory depression, or severe hypertension." (Doc. 12 at 19.)  Plaintiff's argument is unpersuasive because the record does not contain any evidence regarding the manner in which Dr. Gottesman inquired about adverse reactions or side effects and whether he distinguished between drowsiness or other "more serious side effects" from Plaintiff's medications.   Additionally, a patient could reasonably consider drowsiness an adverse reaction.   Accordingly, the ALJ properly discounted Plaintiff's testimony that his medication made him sleepy as inconsistent with the medical record.  (Tr. 54.)

### 3.     Conservative Treatment

#### i.     Treatment for Back Impairment

The ALJ also discounted Plaintiff's symptom testimony because he received "conservative" treatment.  (Tr. 28.)  Plaintiff's treatment for his low back pain included numerous steroid injections and narcotic pain medication.  (*See* Section II.A.2 and 3.) The ALJ characterized this treatment as conservative.  (Tr. 28.)  A conservative course of treatment may discredit a claimant's allegations of disabling symptoms.  *See Tommasetti v. Astrue,* 533 F.3d 1035, 1040 (9th Cir. 2008) (an ALJ may infer that a claimant's

1   "response to conservative treatment undermines [his] reports regarding the disabling

2   nature of his pain"); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007), (treatment of

3   ailments with over-the-counter pain medication is "conservative treatment" sufficient to

4   discount testimony); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (failure to

5   request "any serious medical treatment for [claimant's] supposedly excruciating pain"

6   was adequate reason to reject claimant's pain testimony); *Johnson v. Shalala*, 60 F.3d

7   1428, 1434 (9th Cir. 1995) (conservative treatment can suggest a lower level of both pain

8   and functional limitation, justifying adverse credibility determination); *see also Bunnell*

9   *v. Sullivan*, 947 F.2d 341, 346 (9th Cir.1991) (failure to seek medical treatment can

10   justify an adverse credibility determination).

11   Here, Plaintiff's treating doctors regularly administered injections for his back

12   pain and prescribed narcotic pain medication (Perocet and Oxycontin).   (See Section

13   II.A.2 and 3.)   This treatment was not conservative.  *See Lapeirre–Gutt v. Astrue*, 382

14   Fed. App'x 662, 664 (9th Cir. 2010) (treatment with narcotic pain medication, occipital

15   nerve blocks, trigger-point injections, and cervical fusion surgery was not conservative);

16   *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (describing conservative treatment

17   as, for example, a physician's failure 'to prescribe . . . any serious medical treatment for

18   [a claimant's] supposedly excruciating pain."); *Kephart v. Colvin*, 2014 WL 2557676, at

19   *5 (C.D. Cal. Jun. 6, 2014) (concluding that Toradal injections and medial branch block

20   treatment for the plaintiff's back pain were not conservative); *Christie v. Astrue*, 2011

21   WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to categorize trigger point

22   injections, epidural shots, and narcotic pain medication as conservative); *but see Pruitt v.*

23   *Astrue*, 2012 WL 2006150, at *2 (C.D. Cal. Jun. 5, 2012) (affirming the ALJ's adverse

24   credibility determination based on the conservative nature of the plaintiff's treatment

25   when the plaintiff "seldom received follow-up care for her complaints of pain, and did

26   not undergo more aggressive treatment, such as narcotic or steroidal medication . . . .");

27   *Hernandez v. Astrue*, 2008 WL 2705083, at *3 (C.D. Cal. Jul. 9, 2008) (Motrin is

28   conservative treatment) *Muro v. Astrue*, 2008 WL 5076448, at *5 (C.D. Cal. Nov. 28,

1    2008) (finding Flexeril, a muscle relaxer, and physical therapy conservative treatment).

2    Accordingly, it was improper for the ALJ to discount Plaintiff's testimony regarding his

3    pain and symptoms related to his back impairment because he received what the ALJ

4    characterized as conservative treatment.

5                    ii.       **Treatment for Carpal Tunnel Syndrome (CTS)**

6            The ALJ also rejected Plaintiff's pain and symptom testimony related to his CTS

7    because that impairment was "conservatively treated with night splints." (Tr. 30.)  The

8    record reflects that in May 2009, Dr. Beauchene discussed with Plaintiff "various

9    treatment forms" for his CTS, including accepting his level of pain and dysfunction,

10   avoiding aggravating activities, hand therapy, splints or cortisone injections, and surgical

11   intervention.   (Tr. 316.)   At that time, Plaintiff elected surgery ("left carpal tunnel

12   decompression"). (*Id.*)  Plaintiff, however, did not have surgery in 2009.

13           Plaintiff saw Dr. Steingart for his CTS in 2010.  (Tr. 681.)  Dr. Steingart advised

14   Plaintiff to wear a splint at night for his CTS symptoms.  (Tr. 681, 688.)  Dr. Steingart

15   noted that Plaintiff "[knew] that he need[ed] surgery" but he did not "have money for a

16   hospital stay." (Tr. 682.)  In June 2010, Dr. Steingart noted that Plaintiff elected surgery

17   for his CTS because "he agree[d] that it was [in] his best interest." (Tr. 689.)  He stated

18   that surgery would be scheduled after medical clearance and insurance authorizations

19   were completed. (*Id.*)  The record reflects that Plaintiff did not have surgery for CTS.

20   He told Dr. Steingart that he could not afford the hospital stay.[4] (Tr. 682.)

21           Although Plaintiff did not have surgery for his CTS, the record reflects that the use

22   of wrist splints was not effective at alleviating his symptoms and that Dr. Steingart

23   thought surgery was in Plaintiff's "best interest." (Tr. 689)  Considering the

24   recommendation for CTS surgery, the ALJ erred in concluding that wrist splints provided

25   _____

26           [4]  Defendant disputes whether Plaintiff could afford surgery for his CTS because
     he testified that he had medical insurance through his wife.  (Doc. 13 at 21; Tr. 55.)
27   Although Plaintiff had medical coverage, he argues that medical insurance does not cover
     all expenses related to medical procedures.  (Doc. 19 at 9 n.5.)  The ALJ did not make
28   any determinations regarding Plaintiff's ability to pay for the CTS surgery, accordingly,
     the Court does not further consider this issue.

1   sufficient relief from Plaintiff's CTS symptoms and that his testimony regarding those
2   symptoms was not credible.  Therefore, upon review of the record as a whole, the Court
3   concludes that, with the exception of the ALJ's determination that Plaintiff's testimony
4   that his medication made him drowsy was not credible, the ALJ did not provide clear and
5   convincing reasons to support her credibility determination.

6          **C.     Medical Opinion Evidence**

7          Plaintiff argues that the ALJ erred by giving "little weight" to the May 2010 and
8   February 2011 opinions of treating physician Gottesman.  (Tr. 29 (citing Admin. Hrg.
9   Exs. 13F, 19F, 25F).)  As discussed below, the Court agrees.

10         In weighing medical source evidence, the Ninth Circuit distinguishes between
11  three types of physicians: (1) treating physicians, who treat the claimant; (2) examining
12  physicians, who examine but do not treat the claimant; and (3) non-examining physicians,
13  who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.
14  1995).  Generally, more weight is given to a treating physician's opinion.  *Id*.  The ALJ
15  must provide clear and convincing reasons supported by substantial evidence for
16  rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *Reddick v.
17  Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion
18  of a treating or an examining physician by providing specific and legitimate reasons that
19  are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211,
20  1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.  The Court considers Plaintiff's claims
21  regarding the weight the ALJ assigned to Dr. Gottesman's opinion in light of these
22  standards.

23         As previously noted, Dr. Gottesman opined that, in an eight-hour day, Plaintiff
24  could sit for a total of two hours and could stand or walk for a total of two hours.
25  (Tr. 450, 596, 636.)  Dr. Gottesman further found that Plaintiff's pain and fatigue could
26  be expected to result in "moderately severe" limitations on his ability to sustain work
27  activity.  (Tr. 451, 597, 637.)  To support his opinions, Dr. Gottesman noted that Plaintiff
28  had been diagnosed with lumbosacral radiculopathy, osteoarthritis, degenerative joint

1   disease, degenerative disc disease, spinal stenosis, lumbosacral facet syndrome, and

2   chronic pain managed with narcotics.  (Tr. 450, 596, 636.)

3       The ALJ assigned little weight to Dr. Gottesman's opinions because he did not

4   provide analysis or explanation for his opinions and the objective medical evidence did

5   not support the degree of limitation that Dr. Gottesman identified.   (Tr. 29.)   First,

6   although Dr. Gottesman's 2010 and 2011 RFC assessments were provided on check-box

7   style forms, Dr. Gottesman completed those forms based on his experience treating

8   Plaintiff over the course of several years, and his opinions were supported by his

9   treatment records that regularly noted pain despite numerous injections and narcotic pain

10  medications.  (*See* Section II.A.2.)  Additionally, Dr. Gottesman noted that his opinions

11  were supported by Plaintiff's diagnoses of lumbosacral radiculopathy, osteoarthritis,

12  degenerative joint disease, degenerative disc disease, spinal stenosis, lumbosacral facet

13  syndrome, and chronic pain managed with narcotics.  (Tr. 450, 596, 636.)

14      Second, to support her conclusion that the "objective evidence of record" did not

15  support Dr. Gottesman's opinions, the ALJ stated that there was no evidence of lumbar

16  radiculopathy or diabetic neuropathy.  (Tr. 29.)  However, the record contained evidence

17  of both.   (Tr. 290 (assessing neuropathy in diabetes); Tr. 268 (radiating back pain and

18  "pain and numbness in legs"); Tr. 365, 366 (radiating back pain to lower extremities).)

19  The Commissioner argues that the record supported the ALJ's assessment of

20  Dr. Gottesman's opinions because his treatment records indicate that Plaintiff reported

21  benefit and increased function from his medications.  (Doc. 13 at 14.)  To support this

22  conclusion, the Commissioner cites five treatment notes stating that injections or

23  medication helped with Plaintiff's pain or functioning.  (Doc. 13 at 14 (citing Tr. 378,

24  379, 403, 427, 434, 438, 548, 580).)[5]  However, because Plaintiff saw Dr. Gottesman at

25  least thirty-seven times, these isolated treatment notes do not detract from the treating

26  physician's opinions regarding Plaintiff's functional limitations.  Additionally, although

27  Plaintiff reported on occasion that his medication or injections provided some help, he

28

      [5]  Tr. 403 and 427 are duplicates, as are Tr. 378 and Tr. 434, and Tr. 379 and 438.

1    continually reported pain and continued to receive additional injections and narcotic

2    medication.

3            Third, the ALJ stated that she gave more weight to Dr. Steingart's "orthopedic

4    opinions regarding the claimant's back, shoulder, and left carpal tunnel syndrome, than to

5    Dr. Gottesman's opinions, because Dr. Steingart was a "specialist in this area." (Tr. 29.)

6    The ALJ, however, fails to acknowledge that Dr. Gottesman was a specialist in pain

7    management. (Tr. 29.)

8            Fourth, Dr. Steingart did not provide a specific opinion regarding Plaintiff's

9    residual functional capacity. Rather, the ALJ's reference to Dr. Steingart's opinions

10   refers to Dr. Steingart's treatment notes. (Tr. 29 (citing Admin. Hrg. Ex. 27F).) Those

11   treatment notes reflect that Dr. Steingart treated Plaintiff for his shoulder and CTS.

12   (Tr. 680-89.) Dr. Steingart did not treat Plaintiff for his back impairments and did not

13   offer any opinions on Plaintiff's abilities to sit, stand, walk, lift, or carry. (Tr. 680-89.)

14           Finally, on a single treatment note, Dr. Steingart noted "normal findings" related

15   to Plaintiff's back and spine. (Tr. 680.) However, that same treatment note indicates that

16   Dr. Steingart was treating Plaintiff for "shoulder pain" and subsequent treatment notes do

17   not contain any information about Plaintiff's back. (Tr. 681-89.) Because Dr. Steingart

18   treated Plaintiff for his shoulder pain and CTS, his single notation of "normal findings"

19   related to Plaintiff's back is not a specific and legitimate reason for discounting

20   Dr. Gottesman's opinions regarding Plaintiff's functional limitations. Therefore, the

21   Court concludes that the ALJ erred in assigning little weight to Dr. Gottesman's opinions.

22   **VII.    Remand for Benefits or for Further Proceedings**

23           Having found that the ALJ erred in assigning little weight to Dr. Gottesman's

24   opinions and in finding Plaintiff's testimony not credible (with the exception of his

25   testimony that his medication made him sleepy), the Court reverses the Commissioner's

26   decision. The Court has the discretion to remand the case for further development of the

27   record or for an award benefits. *See Reddick*, 157 F.3d at 728. The decision to remand

28   for benefits is controlled by the Ninth Circuit's "three-part credit-as-true standard."

1    *Garrison*, 759 F.3d at 1020.  Under that standard, evidence should be credited as true and

2    an action remanded for an immediate award of benefits when each of the following

3    factors are present: "(1) the record has been fully developed and further administrative

4    proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally

5    sufficient reasons for rejecting evidence, whether claimant's testimony or medical

6    opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ

7    would be required to find the claimant disabled on remand."  *Id.* (citing *Ryan v. Comm'r*

8    *Soc. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008)); *see also Lingenfelter*, 504 F.3d at 1041;

9    *Orn*, 495 F.3d at 640; *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Smolen*,

10   80 F.3d at 1292.

11       Plaintiff has satisfied all three criteria of the credit-as-true rule.  On the first factor,

12   there is no need to further develop the record.  Although the Commissioner argues that

13   further proceedings would allow the ALJ to revisit the medical opinions and testimony

14   (Doc. 13 at 25), Ninth Circuit precedent "foreclose[s] the argument that a remand for the

15   purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful

16   purpose' under the first part of the credit-as-true rule."  *Garrison*, 759 F.3d at 1021

17   (citing *Benecke*, 379 F.3d at 595) ("Allowing the Commissioner to decide the issue again

18   would create an unfair 'heads we win; tails, let's play again' system of disability benefits

19   adjudication.")).

20       On the second factor, the ALJ failed to provide legally sufficient reasons for

21   rejecting Plaintiff's testimony and the opinions of treating physician Dr. Gottesman.  On

22   the third factor, if the discredited evidence were credited as true, the ALJ would be

23   required to find Plaintiff disabled on remand because the vocational expert testified that a

24   person with Plaintiff's subjective complaints (dropping objects and the need to lie down

25   during the day)[6] and subject to Dr. Gottesman's opinions regarding pain (that Plaintiff

26

27       [6]  Although the ALJ properly discredited Plaintiff's testimony that he needed to
     nap because his medication made him drowsy, Plaintiff also testified that he had to lie
28   down several times a day to alleviate his pain.  (Tr. 51.)  The reason that Plaintiff needed
     to lie down during the day — because he was tired or in pain — does not matter because,
     in either case, he needed to lie down several times a day.

had moderately severe pain), would be incapable of any sustained work.  (Tr. 62, 70-71.)
Therefore, based on this evidence, Plaintiff is disabled.  *See Garrison*, 759 F.3d at 1022
n.28 (stating that when the vocational expert testified that a person with the plaintiff's
RFC would be unable to work, "we can conclude that [the plaintiff] is disabled without
remanding for further proceedings to determine anew her RFC.").

Having concluded that Plaintiff meets the three criteria of the credit-as-true rule,
the Court considers "the relevant testimony [and opinion evidence] to be established as
true and remand[s] for an award of benefits[,]" *Benecke*, 379 F.3d at 593 (citations
omitted), unless "the record as a whole creates serious doubt as to whether the claimant
is, in fact, disabled with the meaning of the Social Security Act."  *Garrison*, 759 F.3d at
1021) (citations omitted).

Considering the record as a whole, there is no reason for serious doubt as to
whether Plaintiff is disabled.[7]  The ALJ failed to set forth specific and legitimate reasons
supported by substantial evidence for rejecting the opinions of Dr. Gottesman.  When a
hypothetical question was posed to the vocational expert incorporating limitations
identified by Dr. Gottesman, the vocational expert testified that such limitations would
preclude Plaintiff from working.  (Tr. 62.)  Additionally, the ALJ did not provide clear
and convincing reasons for discrediting Plaintiff's symptom testimony.[8]  The vocational
expert testified that the limitations that Plaintiff described would preclude sustained
employment.  (Tr. 70, 71.)  Therefore, Plaintiff is entitled to benefits.  On the record
before the Court, Dr. Gottesman's opinions and Plaintiff's subjective complaints should
be credited as true and the case remanded for an award of benefits.

Accordingly,

---

[7]  Because Plaintiff has established that he is disabled under the Act based on the
ALJ's erroneous rejection of Dr. Gottesman's opinion and Plaintiff's testimony, there is
no need to address Plaintiff's alternative arguments.

[8]  The ALJ did not err in rejecting Plaintiff's testimony that his medications made
him drowsy.  Accordingly, the Court does not consider this testimony in its
determination.

**IT IS ORDERED** that the Commissioner's decision denying benefits is **reversed** and this matter is **remanded** for an award of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 16th day of October, 2014.

_____
Bridget S. Bade
United States Magistrate Judge

- 23 -